**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RITA BENCZKOWSKI,** | : | **No. 3:21cv1066** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **BOHLIN CYWINSKI JACKSON,** | : | |
| **Defendant** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

This is an employment discrimination action filed by Plaintiff Rita Benczkowski against her former employer Defendant Bohlin Cywinski Jackson ("BCJ") pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 621(a) ("ADEA") and the Pennsylvania Human Relations Act, 43 PA. STAT. § 955 ("PHRA"). Before the court are: 1) a motion for summary judgment filed by the defendant, (Doc. 20); and 2) a motion for leave to file an amended complaint filed by the plaintiff, (Doc. 26). Having been fully briefed, these motions are ripe for a decision.

**Background**

BCJ operates an architectural firm with studios in Philadelphia, Pittsburgh, San Francisco, Seattle, and Wilkes-Barre, Pennsylvania.[1] (See Doc. 23-1, Exh.

---

[1] All facts from the record are construed in a light most favorable to plaintiff as the nonmoving party. See Daniels v. Sch. Dist. of Philadelphia, 776 F.3d 181, 187 (3d Cir. 2015)(citation omitted).

C, K. May Dep. 55:23-56-21).  The firm hired Benczkowski in 2003 to work in its

Wilkes-Barre studio. (Doc. 20-1, SOF ¶¶ 8, 10).  At the time of separation from

BCJ, Benczkowski worked as a project accountant. (Id. ¶ 9).  Project accountants

generally handled the financial components of BCJ's architectural projects for the

firm. (Doc. 23-1, Exh. D, P. Bassett Dep. 16:6-17).  Project accountants also had

the ability to propose additional service contracts if project billings were

exceeding the project amounts. (Id. 17:20-18:16).  Such additional services

contracts were positive financially for the firm. (See id. 18:17-19).

Benczkowski was born in 1962.  (Doc. 20-1, SOF ¶¶ 7).  During her tenure

at the firm, Benczkowski received an increase in her salary nearly every year and

sometimes twice in one year. (Doc. 23-2, R. Benczkowski Dep. Exh. 4, Empl.

Pos. & Sal. Hist.).  By 2019, she worked in a fully remote setting from her home

in Plains Township, Pennsylvania. (Doc. 20, SOF ¶ 16).  Benczkowski suffered

from severe allergies exacerbated by working in the Wilkes-Barre studio.  (Id. ¶

14; see also Doc. 23-1, R. Benczkowski Dep. 27:18-33:8).

As a project accountant for BCJ, Benczkowski teamed with project

managers (architects) based in BCJ's San Francisco studio. (Doc. 23-1, Exh. A.,

R. Benczkowski Dep. 24:19-25:13; Exh. C, K. May Dep. 59:7-10; Exh. E. Dep. of

W. Loose, 73:2-6).  For a time, she supported BCJ's work for Apple, Inc.

("Apple"), which required "a great deal of accounting backup [and] individual

2

billings," and accordingly, "her workload was higher as a result[.]" (Id., Exh. E. W. Loose Dep., 62:13-24). At some point prior to 2017, client work for Apple began to taper off. (Id.; see also Exh. C., K. May Dep., 20:9-21:6). Per William Loose, a BCJ shareholder-principal and board member, less work was required to support the San Francisco studio after Apple projects diminished. (Id., Exh. E. W. Loose Dep. 9:7-11:2, 110:14-111:1). On the other hand, BCJ's former chief executive officer ("CEO") Patrick Bassett believed the San Francisco studio provided the greatest amount of revenue during his tenure with the firm. (Id., Exh. D., P. Bassett Dep. 30:3-6). BCJ's chief financial officer ("CFO") Kate May could not quantify whether Benczkowski's workload was reduced following the completion of Apple projects and she testified that any attempts to quantify her workload would involve some subjective components. (Id., Exh. C. K. May Dep., 84:10-87-6). Per CFO May, there is no formula even at the present to compare the workloads of one project accountant to another at the firm. (Id.)

Benczkowski contends that she remained busy with work for the San Francisco studio after BCJ's projects for Apple tapered off. (Id. Exh. A. Dep. of R. Benczkowski 93:13-24). According to the plaintiff, other project accountants serving different BCJ studios had lower workloads than she did. (Id. at 112:4-114:5). Benczkowski also testified that some of her projects had fifty or more additional services contracts unlike projects in other studios, which resulted in a

large workload. (Id. 151:20-153:22).  Additionally, CEO Bassett testified that BCJ tasked Benczkowski with contract negotiation and contract review, which were later sent to outside counsel. (Id., Exh. D., P. Bassett Dep. 30:23-31:22).  CEO Bassett believed such duties were unique to Benczkowski with the San Francisco studio. (Id. 31:23-32:1).  Benczkowski also testified that she was excluded from working with the other project accountants, who otherwise supported each other's work and backed each other up. (Id. Exh. A. Dep. of R. Benczkowski at 119:2-120:6).  Per CEO Bassett, a clique of two or three had formed in Benczkowski's department "[t]hat were not very inclusive or collaborative with the other project accountants[.]" (Id., Exh. D, P. Bassett Dep. 25:17-2).

The other project accountants had less experience at BCJ and earned less in salary.  After seventeen (17) years with BCJ, Benczkowski earned a yearly salary of $105,560. (Doc. 20-1, SOF ¶ 18).  In March 2020, she was also the oldest project accountant at the firm. (Doc. 23-1, Exh. C, K. May Dep. 95:3-7). As for the other project accountants:

- Hannah Beach earned $74,360 per year. (Doc. 28-1, ECF p. 12). Beach was born in 1988 and began working for BCJ in 2015.[2] (Doc. 23-2, Df. Ans. to Interrog. #2b, ECF p. 30; Doc. 28-2, K. May Dep. Exh. 14).

---

[2] BCJ hired Beach as a project accountant. (Doc. 23-1, Exh. C, K. May Dep. 61:7-62:5).  In the year BCJ hired Beach, Benczkowski earned a salary of $96,200. (Doc. 23-2, R. Benczkowski Dep. Exh. 4, Empl. Pos. & Sal. Hist.).  Beach teamed with BCJ's Pittsburgh studio. (Doc. 23-1, Exh. C, P. Bassett Dep. 23:3-10).

4

- Sarah Boyle earned $55,640 per year. (Doc. 28-1, ECF p. 12).  Boyle began working for BCJ in 2012 and was in her thirties.[3] (Doc. 23-1, Exh. B., S. Coach Dep. 55:14-16; Doc. 28-2, K. May Dep. Exh. 14).

- Farah Tasgin earned between $50,000-$55,000 per year.  (Doc. 23-1, K. May Dep. 59:2-59:20).  Tasgin was born in 1991 and began working for BCJ in 2015.[4] (Doc. 23-2, Df. Ans. to Interrog. #2b, ECF p. 30; Doc. 28-2, K. May Dep. Exh. 14).

Another project accountant, Theresa Sparacio, departed BCJ in December 2019 (later to return).[5] (Doc. 23-1, K. May Dep. 98:3-14).   She earned a salary in the mid-$70,000 range. (Id. 50:8-18).  Sparacio was also in her thirties. (Doc. 23-1, Exh. B., S. Coach Dep. 55:14-16).

CEO Bassett started consulting with BCJ in the fall of 2018. (Id., Exh. D, P. Bassett Dep. 13:6-10).  He became CEO in October 2019. (Id. 9:16-23).  Bassett departed the firm in August 2020. (Id. 9:16-10:7).  During that tenure, CEO

---

[3] BCJ hired Boyle in 2012 in a different role while Boyle was still in college. (Doc. 23-1, Exh. C, K. May Dep. 61:7-62:5). The summary judgment record does not indicate the year that BCJ moved Boyle into a project accountant position. CEO Bassett believed Boyle teamed with the Wilkes-Barre studio. (Doc. 23-1, Exh. C, P. Bassett Dep. 23:3-10).  From March 2012 to March 27, 2020, Benczkowski's salary increased by $26,000. (Doc. 23-2, R. Benczkowski Dep. Exh. 4, Empl. Pos. & Sal. Hist.).

[4] BCJ hired Tasgin in a different role handling firm payables. (Doc. 23-1, Exh. C, K. May Dep. 61:7-62:5).  The summary judgment record does not indicate the year that BCJ moved Tasgin into a project accountant position. CEO Bassett believed Tasgin teamed with the Seattle studio. (Doc. 23-1, Exh. C, P. Bassett Dep. 23:3-10).

[5] BCJ initially hired Sparacio as a project accountant. (Doc. 23-1, Exh. C, K. May Dep. 61:7-62:5). The summary judgment record does not indicate when Sparacio was initially hired. As a project accountant, Sparacio teamed with the Philadelphia studio per CEO Bassett. (Doc. 23-1, Exh. C, P. Bassett Dep. 23:3-10).  Bassett believed that the clique within the project accountant group led to Sparacio's initial departure from BCJ. (Id. 25:17-26:2).

5

Bassett analyzed financials with CFO May and determined that BCJ was not in a strong financial position even prior to COVID-19 related shutdowns. (Id. 39:9-40:10).  CEO Bassett recommended a "substantial re-sizing for the firm[.]" (Id.) Firm principals agreed to resize through a combination of layoffs, furloughs, and salary reductions. (Id.)

CEO Bassett described a process where he and CFO May collaborated with BCJ's board of directors before that group presented resizing recommendations.[6] (Id. 42:20-43:3).  CFO May testified that Benczkowski's six-figure salary caught the attention of principals at the firm.  (Id. Exh. C., K. May Dep. 46:2-15, 48:12-24).

On March 27, 2020 and against the backdrop of the COVID-19 pandemic, BCJ informed its employees that they would all have their pay cut by ten percent (10%) and senior employees would have their pay cut by fifteen percent (15%). (Doc. 20-1, SOF ¶ 32).  BCJ also cut shareholder and executive pay by twenty percent (20%) at that time. (Id.)

Although pay cuts were announced across the board, BCJ addressed Benczkowski's salary differently.  On March 27, 2020, BCJ informed

---

[6] CEO Bassett also testified that, pre-COVID, he participated in a company-wide initiative to perform a salary review by gender, title, and years of experience using data software. (Id. 49:16-51:22). Benczkowski's salary stood out. (Id.) Per CEO Bassett, the firm did not want to discriminate based on gender in a heavily male-based industry. (Id.)  All of the project accountants at the firm, however, were female. (Id.)  Bassett did not perform a salary review of company-wide data based on age per his testimony. (Id.)

Benczkowski that it was cutting her pay from $105,560 to $80,000, roughly a twenty-five percent (25%) reduction. (Id. ¶ 34). BCJ also made plaintiff's pay reduction permanent in contrast to other employees. (See 23-1, Exh. D, P. Bassett Dep. 40:21-41:9).

Benczkowski testified that, on a teleconference, she was told that her salary was cut permanently because she was being paid more than 100% of the amount paid to Boyle and that revenues from the San Francisco studio were "less than the other project accountants." (Doc. 23-1, Exh. A., R. Benczkowski Dep. 59:5-22).  Per the plaintiff, CEO Bassett told her during the call that her seniority did not matter. (Id. 60:19-61:1).

CFO May testified that Benczkowski's salary reduction had nothing to do with the workload coming into the San Francisco studio. (Id., Exh. C, K. May Dep. 91:22-92:7). CEO Bassett also inconsistently testified that Benczkowski's pay cut was and was not related to COVID-19. (Id., Exh. D, P. Bassett Dep. 52:13-54:10).  BCJ shareholder-principal Loose testified that the reduction was "realigning her project responsibilities with her salary." (Id., Exh. E, W. Loose Dep. 62:7-12).  Loose also related Benczkowski's salary reduction to the loss of Apple business in the San Francisco studio. (Id. 62:13-64:14).

On March 30, 2020, BCJ laid off and furloughed employees and reduced other employees' hours. (Doc. 20-1, SOF ¶ 21).  BCJ laid off Benczkowski's

7

supervisor.[7] (Doc. 20-1, SOF ¶ 27).  BCJ also furloughed a project accountant,

Tasgin. (Id. ¶ 26).  Benczkowski was neither laid off nor furloughed.  (Id. ¶ 25).

BCJ did not reduce Benczkowski's hours. (Id.)

On the afternoon of the date pay cuts were announced, March 27, 2020,

Benczkowski emailed CEO Bassett and CFO May requesting a meeting the

following week. (Doc. 23-2, R. Benczkowski Dep., Exh. 6).  Benczkowski sought

the meeting "to discuss [her] workload to reduce [her] overtime." (Id.)

Benczkowski testified that her workload had been extremely high for much of her

tenure, and she did ask for help at that time. (Doc. 23-1, Exh. A., R. Benczkowski

Dep. 54:6-24).

In a meeting the following week with CEO Bassett and CFO May, BCJ

sought to reallocate Tasgin's workload from the Seattle studio, i.e., assign more

work to the remaining project accountants. (Doc. 23-2, R. Benczkowski Dep.,

Exh. 8).  On April 1, 2020, CFO May emailed Benczkowski and Beach with a

---

[7] Prior to the layoff, Benczkowski's supervisor, Tara Shrader, carried the title "accounting manager" and did not perform the same tasks as project accountants. (Doc. 23-1, Exh. C, K. May Dep. 65:12-67:4).  Per CFO May, Shrader performed general ledger reporting, handled taxes, communicated with auditors, and performed other tasks that BCJ later automated. (Id.) CFO May also testified that Shrader "probably picked up Sarah's work[,]" referring to Boyle's project accountant tasks. (Id. 88:8-17).  Per CFO May, Shrader and Boyle are sisters. (Id. 88:22-23). Prior to the layoff, Shrader earned a salary of approximately $75,000. (Doc. 20-1 SOF ¶ 47).  Shrader's duties were absorbed by CFO May and BCJ's human resources director Sandra Coach. (Doc. 23-1, Exh. B., S. Coach Dep. 57:5-19).  CFO May believed that Shrader's tasks were not worth the money BCJ paid her and that some of her duties were redundant. (Doc. 23-1, Exh. C, K. May Dep. 95:21-97:12).

reallocation proposal made to BCJ's principals, including the transfer of four project managers' matters to Benczkowski. (Id.).  These projects included BCJ's work on storefronts for online retailer Everlane. (Id.; Doc. 23-1, Exh. C, K. May Dep. 59:18-20).  Benczkowski responded that she could not take on additional workload at that time. (Doc. 23-2, R. Benczkowski Dep. Exh. 8).  She testified that any changes in her responsibilities around that time did not free her up to take on some of Tasgin's work since her "workload was already more than [she] could perform in an eight-hour day." (Doc. 23-1, Exh. A, R. Benczkowski Dep. 66:17-20; 67:8-17).  Benczkowski believed Beach had time to take on extra work. (Id. 68:5-13).  CFO May agreed that Beach's studio (Pittsburgh) was not "a very busy office" in 2020. (Id., Exh. C, K. May Dep. 62:6-65:6).

Loose, as a director and shareholder in the Wilkes-Barre studio, periodically checked in with employees in that office during the COVID-19 pandemic. (Id., Exh. E, W. Loose Dep. 31:9-12, 69:11-23).  On April 28, 2020, Benczkowski spoke by telephone with Loose. (Id.)  Prior to the call with Benczkowski, CFO May tipped Loose off that Benczkowski would focus on the salary reduction during the call. (Id., 70:4-71:9; Exh. C, K. May Dep. 69:11-70:17).  Loose memorialized the call with Benczkowski in an email to CEO Bassett and CFO May. (Doc. 23-2, W. Loose Dep. Exh. 15). That email provided:

> I just got off of my call with Rita and it was about nothing
> other than her salary reduction.  She started probing for

9

what I knew, and I played largely dumb; I told her the truth in that I only heard of this yesterday so she knows more of the details than I do (thank you very much for the warning, Kate!!).  I asked her to tell me what she knew, and I didn't add anything to it.

She mentioned the salary alignment issue relative to the other PACs and she was dismissive of that, but then she also kept saying that her salary was reduced relative to the SF office's income, and that was totally unfair to do as no one else's salary was similarly reduced. That sounded strange to me and I told her that I think she is misreading that; I kept trying to redirect that back to workload, not an office's income.

I offered that my impression of the situation is that her workload has been reduced as a result of not working for Apple any longer. She kept insisting that her workload has not diminished. She also insisted that her job description is more than the normal PAC, and it was designed that way when she started supporting the (then) fledgling SF office (that was news to me). She kept mentioning the contract and proposal review that she does and no one else does; I kept telling her that Sarah [Boyle] reviews all of ours for a numbers check as any Pac [sic] does, but not for legal terminology. She kept insisting she does more than that; but when she described it, it seemed not much more than rates, math errors, etc. I know from hearing from you both she has drifted outside that realm, but I did not mention that on the call, it seemed unimportant.

She also kept insisting that she feels her position is in jeopardy, and I said I heard not heard that at all [sic]. She mentioned that she would either want to swap positions with Sarah (?) or that she is entertaining the idea of offering to be laid off. She asked my opinion of the latter, and I said she would have to have that conversation with both of you….

(Id.)

CFO May responded to Loose's email, writing, in part: "Let's plan on discussing with Patrick [Bassett, CEO].  Her salary reduction had nothing to do with the workload coming out of the SF office. She was being overpaid for the position and it was the right time to right size. I am glad that we were able to connect yesterday." (Id.)

On May 8, 2020, BCJ generally restored employee compensation to levels immediately before the March pay reductions. (Doc. 20-1, SOF ¶ 42).  Tasgin also returned from furlough to resume work as a project accountant for the Seattle studio that month. (Doc. 23-1, Exh. C, K. May Dep. 66:13-17).  BCJ, however, did not restore Benczkowski's previous salary.  Per CFO May, Benczkowski spoke to Loose again to discuss a severance package at the end of the month of May. (Id. 79:16-80:19).  These discussions did not progress. (Id.)

Shortly thereafter, on June 1, 2020, Benczkowski passed out several times at home and required emergency room treatment. (Id., Exh. A., R. Benczkowski Dep. 94:21-96:9).  Plaintiff testified that her primary care doctor attributed these issues to stressors from work. (Id. 96:2-97:16).  Plaintiff subsequently used leave pursuant to the Family and Medical Leave Act ("FMLA") between June and August 2020 to address her medical issues.  (Id. 99:7-100:2).  Beach, another project accountant, also used FMLA leave at this time, but ultimately did not return to work. (Doc. 23-1, K. May Dep. 98:3-14).  Tasgin, the project accountant

11

that was previously furloughed, departed employment at BCJ in June 2020. (Doc. 28-2, K. May Dep. Exh. 14).

With the absence of both Benczkowski and Beach on FMLA leave and with Tasgin's departure, project accountant duties were being performed by Boyle and CFO May. (Doc. 23-1, K. May Dep. 135:9-136:1).  As a result, CFO May then rehired a former project accountant, Sparacio, in a promoted role as a senior project accountant. (Id. 132:14-22; 135:9-136:1).  In that newly created position, Sparacio became plaintiff's new supervisor. (Id., Exh. B. S. Coach Dep. 65:19-23).  Sparacio was in her late thirties. (Id. 55:14-16).  Benczkowski believed BCJ rehired Sparacio at a $85,000 salary. (Id., Exh. A. R. Benczkowski Dep. 15:2-16:9).

In late August 2020, Benczkowski returned to work from FMLA leave to hundreds of emails, looming billing deadlines, and meeting requests.  (Id. 101:21-109:1).  She required antianxiety medication to resume working. (Id. 97:12-21).

On September 2, 2020, Benczkowski attended a virtual meeting at CFO May's request. (Id. 109:17-111:5).  The meeting concerned Benczkowski's pay decrease and the permanency of same, Sparacio's role as plaintiff's supervisor, and the mandatory nature of meetings that plaintiff was not attending. (Id.)

12

Benczkowski described the meeting as very hostile to the point where she had to stop working that day. (Id. 130:8-19).

Benczkowski then resigned on September 8, 2020. (Doc. 20-1, SOF ¶ 57). She cited unfair treatment and the toll it had taken on her health in her resignation email. (Doc. 23-2, S. Coach Dep. Exh. 12). Benczkowski believed continued employment with BCJ risked serious consequences to her health. (Id.).

Benczkowski then filed a charge of discrimination with the Equal Opportunity Employment Commission ("EEOC") on September 22, 2020. (Doc. 20-1, SOF ¶ 3). She dual-filed the charge with the Pennsylvania Human Relations Commission ("PHRC"). (Id.) On March 19, 2021, the EEOC issued a notice of right to sue. (Id. ¶ 4). Benczkowski initiated this civil action on June 16, 2021. (Doc. 1)

In Count I of Benczkowski's complaint, she alleges defendant violated the ADEA when it demoted her and reduced her salary in March 2020 on the basis of her age. (Id. ¶ 54). In Count III, plaintiff alleges defendant violated the ADEA by constructively discharging her. (Id. ¶ 63). Counts II and IV advance the same age discrimination allegations and assert that defendant violated the PHRA. (Id. at ¶¶ 58, 68). BCJ answered the complaint on August 16, 2021. (Doc. 4).

Following discovery, BCJ filed a motion for summary judgment on all claims in the complaint, (Doc. 20), and plaintiff filed a motion for leave to file an

amended complaint, (Doc. 26).  Benczkowski seeks leave to bring claims pursuant to the FMLA based on CFO May's testimony during her deposition where May detailed the rehiring of Sparacio as supervising project accountant while Benczkowski exercised FMLA leave. (See Doc. 27, Br. in Supp. at 7-10). Benczkowski also seeks to amend allegations related to her exhaustion of administrative remedies with the PHRC to proceed with her PHRA claims. (Id. at 10-12).  Having been fully briefed, both motions are ripe for disposition.

**Jurisdiction**

Because this case is brought pursuant to the ADEA, the court has jurisdiction pursuant to 28 U.S.C. § 1331. ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). The court has supplemental jurisdiction over plaintiff's PHRA claims pursuant to 28 U.S.C. § 1367(a). ("In any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.").

14

**Standard of Review**

BCJ has filed a motion for summary judgment.  Granting summary

judgment is proper " 'if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law.' " See Knabe v. Boury Corp., 114 F.3d 407, 410 n. 4

(3d Cir.1997) (quoting FED. R. CIV. P. 56(c)).  "[T]his standard provides that the

mere existence of *some* alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no *genuine* issue of *material* fact." Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the

facts in the light most favorable to the party opposing the motion. Int'l Raw

Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir.1990).  The

burden is on the moving party to demonstrate that the evidence is such that a

reasonable jury could not return a verdict for the non-moving party. Anderson,

477 U.S. at 248 (1986).  A fact is material when it might affect the outcome of the

suit under the governing law. Id.  Where the non-moving party will bear the

burden of proof at trial, the party moving for summary judgment may meet its

burden by showing that the evidentiary materials of record, if reduced to

15

admissible evidence, would be insufficient to carry the non-movant's burden of

proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Once the

moving party satisfies its burden, the burden shifts to the nonmoving party, who

must go beyond its pleadings, and designate specific facts by the use of

affidavits, depositions, admissions, or answers to interrogatories showing that

there is a genuine issue for trial. Id. at 324.

"In employment discrimination cases, the summary judgment standard 'is

applied with added rigor' because 'intent and credibility are crucial issues.'"

Walden v. St. Gobain Corp., 323 F.Supp. 2d 637, 641 (E.D. Pa. 2004)(quoting

Stewart v. Rutgers Univ., 120 F.3d 426, 431 (3d Cir. 1997)).  Moreover:

> Employment discrimination cases center around a single
> question: why did the employer take an adverse
> employment action against plaintiff? Because this is clearly
> a factual question, summary judgment is in fact rarely
> appropriate in this type of case. Simply by pointing to
> evidence which calls into question the defendant's intent,
> the plaintiff raises an issue of material fact which, if
> genuine, is sufficient to preclude summary judgment.

Marzano v. Computer Sci. Corp. Inc., 91 F.3d 497, 509–10 (3d Cir. 1996)(internal
quotations and explanatory parentheticals omitted).

**Analysis**

BCJ argues that summary judgment is appropriate on each of

Benczkowski's age-discrimination claims.  Specifically, the defendant contends

that the plaintiff failed to connect the salary reduction to age discrimination and

16

asserts that plaintiff's resignation forecloses an age-related constructive discharge claim.  Additionally, defendant argues that plaintiff failed to exhaust administrative remedies regarding her PHRA claims.  Plaintiff counters by seeking leave to file an amended complaint on this issue.  The motion to amend also proposes the addition of two new claims for FMLA interference and retaliation.

The court will consider defendant's summary judgment arguments regarding plaintiff's ADEA claims before addressing the parties' various requests for relief regarding the PHRA claims. Finally, the court will address whether plaintiff should be granted leave to add FMLA claims in an amended complaint.

### 1. Motion for Summary Judgment

#### a. Plaintiff's ADEA Claim – Salary Reduction

Counts I and III of Benczkowski's complaint advance claims for age discrimination in violation of the ADEA.[8]  Count I alleges that BCJ violated the ADEA when it demoted the plaintiff and permanently cut her salary amid temporary pandemic-related pay reductions.  Although there is evidence that

---

[8] Counts II and IV assert the claims pursuant to the PHRA under the same legal theories. The court refers to plaintiff's ADA and PHRA claims collectively. See Colwell v. Rite Aid Corp., 602 F.3d 495, 500, n. 2 (3d Cir. 2010)("[T]he same legal standard that applies to the ADA applies equally to disability discrimination claims under the PHRA.").  To the extent that plaintiff's PHRA claims hinge on whether she exhausted her administrative remedies, the court will address those arguments in Section 2.

BCJ removed some of Benczkowski's job duties at or near the time of her pay cut, the parties focus their arguments on plaintiff's salary reduction.  The court thus focuses on the record relative to that event in considering Count I.

"The ADEA prohibits employers from 'discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.' " Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 643–44 (3d Cir. 2015)(quoting 29 U.S.C. § 623(a)(1)).

Benczkowski concedes there is no direct evidence of age discrimination. ADEA claims with circumstantial evidence of discrimination are analyzed under the McDonnell Douglas burden shifting framework.[9]  Fowler v. AT&T, Inc., 19 F.4th 292, 298 (3d Cir. 2021)(citing Barber v. CSX Distrib. Servs., 68 F.3d 694, 698 (3d Cir. 1995)); Smith v. City of Allentown, 589 F.3d 684, 691 (3d Cir. 2009).

Under this three-step framework, the plaintiff must make a *prima facie* showing of discrimination to survive summary judgment, i.e., "a claim that on first sight has enough merit to proceed." Fowler, 19 F.4th at 298–99 (citation omitted). To make a *prima facie* ADEA discrimination claim, a plaintiff must show that she was: (1) over the age of 40; (2) subject to an adverse employment action; (3) qualified for her position; and (4) the adverse employment action occurred under

---

[9] See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–03 (1973).

circumstances that could give rise to an inference of intentional discrimination because of age. See Gross v. FBL Fin. Servs. Inc., 557 U.S. 167, 180 (2009) (holding that the ADEA requires a plaintiff to prove that age was the but-for cause of the adverse employment action); Fowler, 19 F.4th at 299 (citation omitted); Willis, 808 F.3d at 644 (citations omitted); see also Burton v. Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013).

A *prima facie* showing "is not 'intended to be rigid, mechanized, or ritualistic[,]' " Willis, 808 F.3d at 644 (quoting Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 357 (3d Cir.1999)), but the showing must be sufficient to convince a reasonable factfinder that all the elements are met, see Duffy v. Paper Magic Grp., 265 F.3d 163, 167 (3d Cir. 2001).  The facts necessary to establish a *prima facie* case of employment discrimination vary depending on the particular circumstances of each case. Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 nn. 6–7 (3d Cir. 2003)(citing McDonnell Douglas, 411 U.S. at 802, n. 13).

BCJ argues that Benczkowski cannot establish the fourth element, that is, she cannot show that her pay reduction or constructive discharge was due to her age.[10]  Under the law, Benczkowski may establish the fourth element with evidence of similarly situated employees (comparators) that were treated more favorably or, through circumstantial evidence that shows a causal link between

---

[10] Plaintiff's constructive discharge claim will be discussed more thoroughly in Section 1b.

19

her membership in a protected class and the adverse employment action. Id. at 797-98 & n. 7 (3d Cir. 2003); Jones v. SEPTA, 796 F.3d 323, 327 (3d Cir. 2015).

In response to the motion for summary judgment, plaintiff has proffered the following: BCJ employed several project accountants at the time of plaintiff's permanent salary reduction, Benczkowski, Beach, Boyle, and Tasgin. Beach, Boyle, and Tasgin were in their thirties. Benczkowski was in her late fifties. In contrast to the plaintiff, Beach and Boyle's March 2020 pay reductions were eventually restored and Tasgin was restored to her position and salary after a furlough. Only Benczkowski experienced a permanent salary reduction, as opposed to the younger project accountants. The record is also replete with direct comparisons between Benczkowski and the younger, less-experienced Boyle by BCJ executives. Additionally, the record contains evidence that, instead of restoring plaintiff's salary, BCJ rehired a former project accountant, Sparacio, within three months of the salary reduction in a new supervisory role with a higher salary than Benczkowski. Sparacio was in her thirties. With this, plaintiff establishes a *prima facie* case.

"Once the plaintiff has successfully established a *prima facie* case creating an inference of discrimination, the burden shifts to the employer who must 'articulate a legitimate nondiscriminatory reason for the adverse employment action.' " Willis, 808 F.3d at 644 (quoting Jones v. Sch. Dist. of Phila., 198 F.3d

403, 412 (3d Cir. 1999)(further citation omitted).  BCJ has articulated several

nondiscriminatory reasons for Benczkowski's permanent salary reduction,

including: 1) the state of the company due to a downturn in business; 2) the

COVID-19 pandemic; 3) "resizing" the whole firm; 4) "rightsizing" project

accountant salaries; and 5) the loss of projects for Apple out of the San

Francisco studio, or a combination of these.  Such reasons are sufficient to meet

defendant's burden.

At the third step, "the burden shifts back once more to the plaintiff to show,

by a preponderance of the evidence, that the employer's proffered legitimate,

nondiscriminatory reason[s] [were] pretextual." Willis, 808 F.3d at 644 (citing

Burton v. Teleflex, Inc., 707 F. 3d 417, 426–27 (3d Cir. 2013)).  A plaintiff may

demonstrate pretext in two ways: 1) by pointing to evidence that would allow a

factfinder to disbelieve the employer's reason for the adverse employment action,

i.e., weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions; or 2) pointing to evidence with such probative force that would

allow a factfinder to conclude that the employer's action was because of age,

such as evidence the defendant treated similarly situated, substantially younger

individuals more favorably. See id. at 644–45 (citations omitted).

Benczkowski has countered BCJ's reasons with sufficient evidence

regarding pretext.  As noted above, project accountants in their thirties received

21

different treatment than the plaintiff, that is, their pay did not get cut as much or permanently.  The summary judgment record also reflects that BCJ executives provided slightly different reasons for Benczkowski's salary reduction.  For example, CEO Bassett described a firm-wide "resizing" and CFO May referred to Benczkowski's pay cut as "rightsizing" her salary.  But Benczkowski has evidence that such "rightsizing" used comparisons of the plaintiff to much younger workers.

Moreover, shareholder-principal Loose connected Benczkowski's salary reduction to BCJ's loss of business with Apple.  Benczkowski, however, can point to other evidence that work for Apple tapered off at least three years before her pay was reduced and that architects in the San Francisco studio did not suffer a permanent pay reduction as she did.  And after Loose provided Benczkowski with the Apple-related explanation and summarized that conversation to CEO Bassett and CFO May in an email, CFO May made a point to correct Loose (a member of BCJ's board of directors) in writing.  Such evidence may cause a reasonable jury to disbelieve all the articulated reasons and believe plaintiff's claim that she suffered age discrimination.  Accordingly, the motion for summary judgment on Count I will be denied.

### b. Plaintiff's ADEA Claim – Constructive Discharge

BCJ also argues that plaintiff has not established a genuine issue of material fact that supports her claim for constructive discharge in Count III of the complaint. "The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that [her] 'working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign.' " Green v. Brennan, 578 U.S. 547, 555 (2016) (quoting Pennsylvania State Police v. Suders, 542 U.S. 129, 141 (2004)). Constructive discharge "is assimilated to formal discharge for remedial purposes." Suders, 542 U.S. at 141.

"[T]he law does not permit an employee's subjective perceptions to govern a claim of constructive discharge." Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161 (3d Cir. 1993)(quoting Gray v. York Newspapers, Inc., 957 F.2d 1070, 1079 (3d Cir. 1992)(further citation omitted). Rather, the court employs "an objective standard that asks whether a reasonable person under the circumstances would have felt compelled to resign." Peifer v. Bd. of Prob. & Parole, No. 23-1081, --- F.4th ----, 2024 WL 3283569, at *4 (3d Cir. July 3, 2024)(internal quotation marks and citations omitted).

Factors relevant to a constructive discharge analysis are whether the employer: "(1) threatened the employee with discharge or urged or suggested

23

that she resign or retire, (2) demoted her, (3) reduced her pay or benefits, (4) involuntarily transferred her to a less desirable position, (5) altered her job responsibilities, or (6) gave unsatisfactory job evaluations." Colwell v. Rite Aid Corp., 602 F.3d 495, 503 (3d Cir. 2010)(citing Clowes, 991 F.2d at 1161)(internal quotation marks and brackets removed).  The absence of these factors is not necessarily dispositive. Duffy, 265 F.3d at 168.  And, although not a required showing in all cases, reasonable employees "will usually explore such alternative avenues thoroughly before coming to the conclusion that resignation is the only option." Clowes, 991 F.2d at 1161 & n. 6.

Here, Benczkowski's employer reduced her salary by $25,600 or 25% in March 2020.  Although other project accountants at BCJ were furloughed or had their pay cut at that time, the other younger members of plaintiff's department did not suffer a permanent salary reduction or were restored to their position within two months.  Additionally, the salary reduction was accompanied by an alteration to Benczkowski's job responsibilities.  Specifically, CFO May instructed her to not get involved in contract review or contract negotiation as Benczkowski did in the past. (Doc. 23-1, Exh. C, K. May Dep. 75:2-78:22).  CEO Bassett testified that contract review and term review responsibilities were removed from Benczkowski's functions and moved to legal counsel. (Id., Exh. D, P. Bassett Dep. 30:23-31:18).  Such a change in Benczkowski's job duties aligned with the

24

responsibilities handled by the younger project accountants for their assigned studios for lower pay.

Plaintiff responded to the salary reduction by exploring other options with the company.  Plaintiff asked for assistance from other project accountants with her workload.  She discussed her salary reduction with Loose, a shareholder-principal of the firm.  As part of those discussions, she asked Loose whether there would be restoration of pay, layoff, or offer of a severance package.  She also floated the idea that her workload be swapped with Boyle, the comparator mentioned by CEO Bassett when he advised the plaintiff of her pay cut.  These requests were not implemented.

Per Benczkowski, the salary reduction caused her serious distress, so much so that she required emergency treatment, testing, follow-up visits with her primary care doctor, and prescription medication.  Additionally, she required medical leave from work.

Benczkowski returned to the company on August 27, 2020. (Doc. 23-2, Exh. 1, Coach Dep. Interrog Ans. #7).  During the plaintiff's leave, CEO Bassett decided to depart.  Within Benczkowski's department, Tasgin separated from the company and Beach did not return from FMLA leave.  CFO May brought Sparacio back, but in a new role as senior project accountant with supervisory responsibilities.  Benczkowski testified about the conditions of her return:

25

Q. Okay. And when you came back from that leave, what was your circumstance in terms of the volume of work that you had to perform upon return?

A. It was overwhelming. Everything was just dumped on me. . .when Sarah came back from being furloughed[11], Kate [May, CFO] met with her and brought her up to date on all of her projects so it would be easy for her to come back. She was only out like a month. I came back, I just got e-mails from Kate saying, here, do this, do that, no let's have a meeting so we can catch up or anything. So it was massive, the amount. Three months is a lot of work to have missed.

(Doc. 23-1, Exh. A., Dep of R. Benczkowski 149:5-21).

On September 2, 2020, or within four business days of Benczkowski's return to work, CFO May convened a meeting with the plaintiff to: 1) reiterate or "close the loop" on plaintiff's salary reduction; 2) stress Sparacio's role as the new senior project accountant; and 3) address concerns that the plaintiff did not attend an equity, diversity, and inclusion meeting or respond to certain emails from an architect, Sparacio, and CFO May. (Id. 110:3-112:18, 120:24-125:16). The tenor of that meeting caused Benczkowski to stop working for the day.

Setting aside Benczkowski's subjective feelings about her treatment, she has pointed to objective evidence in this case that, if believed, supports a

---

[11] The record does not indicate that Sarah Boyle was furloughed; rather, the reference to Sarah here may be to Farah Tasgin, the project accountant that received a furlough. In March 2020, Benczkowski worked in a department with individuals named Tara, Sarah, Farah, and Hannah. By September 2020, only Sarah Boyle remained from that group.

position that BCJ compounded the plaintiff's salary reduction with efforts setting her up to fail upon her return from medical leave.  Arguably, plaintiff can also use the record to advance that BCJ executives ultimately restructured the project accounting department through the forced attrition of Benczkowski while valuing younger, lower-paid project accountants.[12]  Such evidence is sufficient for plaintiff's constructive discharge claim in Count III to go to a jury and the motion for summary judgment will be denied.

### 2. Motion for Summary Judgment/Motion to Amend – Administrative Exhaustion

BCJ also seeks summary judgment on Benczkowski's PHRA claims, arguing that the plaintiff did not exhaust her administrative remedies relative to those claims.  Specifically, BCJ argues that Benczkowski filed suit while the PHRC still had jurisdiction of her discrimination charge.

"The Pennsylvania Supreme Court has explicitly held that a discharged employee cannot file a PHRA claim in the judicial system without first exhausting administrative remedies."  Tlush v. Mfrs. Res. Ctr., 315 F. Supp. 2d 650, 656

---

[12] BCJ hired CFO May at a yearly salary of $193,000 in 2019, which was reduced by 20% (or to $154,400) in March 2020 before being fully reinstated to the hiring level in May 2022. (Doc. 23-1, Exh. C K. May Dep.13:17-14:22).  Had Benczkowski not been subject to the permanent pay reduction to $80,000, she, as a project accountant, would have been making about $50,000 less by May 2020 than the company CFO tasked with lowering personnel costs.  In context, such evidence cuts both ways.

(E.D. Pa. 2002)(citing Clay v. Advanced Comput. Applications, Inc., 559 A.2d 917, 920 (Pa. 1989)).  The PHRA requires that a discrimination complaint must be first brought to the PHRC, which has exclusive jurisdiction over the claim for one year. See Burgh v. Borough Council of Borough of Montrose, 251 F.3d 465, 471 (3d Cir. 2001); 43 PA. STAT. § 962(b), (c)(1).  A PHRA complainant may not file an action in court during this period. Id.  A complainant, however, may bring a court action regardless of whether he has received a letter from the PHRC after that one-year period. Id.

"[C]ourts in the Third Circuit have adopted a more flexible approach to PHRA exhaustion by permitting plaintiffs to maintain PHRA claims if the period of exhaustion expires during the pendency of litigation or if plaintiff files an amended complaint after the period of exhaustion." Eldridge v. Municipality of Norristown, 828 F. Supp. 2d 746, 758 (E.D. Pa. 2011), aff'd, 514 F. App'x 187 (3d Cir. 2013)(collecting cases)

In this matter, plaintiff filed a dual charge of discrimination with the EEOC and PHRC on September 22, 2021. (Doc. 20-1, SOF ¶ 3).  On March 19, 2021, the EEOC issued Benczkowski a notice of right to sue. (Id. ¶ 4).  Receipt of such notice provided Benczkowski with ninety (90) days to proceed with her ADEA claims. See 29 U.S.C. § 626(e).  Benczkowski then filed suit on June 16, 2021, approximately eight months after she filed her dual-charge, asserting both ADEA

and PHRA claims. (Doc. 1). Benczkowski specifically alleged in her complaint that her counsel requested that PHRC issue a notice to sue on March 26, 2021, but the notice had not been received at the time the plaintiff filed this action. (Id. ¶ 10).

Benczkowski counters the motion for summary judgment with arguments that she exhausted her administrative remedies on her PHRA claims since the PHRC eventually issued a notice of the right to sue and more than one year has passed since the date Benczkowski filed her charge with the PHRC. (Doc. 28, Pl. Br. in Opp. MSJ at 20). Benczkowski also seeks leave to amend her complaint to aver that she has exhausted all administrative prerequisites of the PHRA claims. (Doc. 26).

In support of her motion to amend, plaintiff has provided a declaration under oath from an administrative officer of the PHRC. (Doc. 32-1). Per that officer's declaration and attachments, the PHRC issued its closure letter on August 26, 2021, notifying the parties that "[b]ased upon the [EEOC] investigation, the PHRC is unable to conclude that the information obtained establishes violations of the statutes." (Id., ¶ 5, Attachment C). Additionally, the PHRC officer indicates that the EEOC did not notify PHRC about its dismissal until June 26, 2021. (Id., ¶ 4, Attachment B). The officer indicates that the delay between receipt of EEOC notice and the issuance of the PHRC closure letter "is

not unusual given the number of dual-filings with the EEOC that are processed by our small team of administrative staff." (Id. ¶ 7).

After receiving her notice to sue from the EEOC on March 19, 2021, plaintiff had ninety (90) days to bring her ADEA claims in this court. If she delayed suit beyond that period to wait on a response from the PHRC, her ADEA claims would have been time-barred.  Additionally, plaintiff's averments indicate that she proceeded in good faith with the PHRC but delays relative to staffing at the agency prevented her from filing suit before exhausting all her administrative remedies.

Benczkowski thus seeks leave to amend her allegations regarding administrative exhaustion.  BCJ counters that Benczkowski unduly delayed her request for an amendment.  Specifically, BCJ points out that: 1) the PHRC notified the plaintiff of closure on August 26, 2021; 2) a case management order set a November 1, 2021 deadline for amended pleadings; and 3) plaintiff did not request leave to file an amended complaint regarding exhaustion for over one year.  (Doc. 30, Df. MSJ Reply Br. at 4-8).

Under the Federal Rules of Civil Procedure, courts are instructed to freely give leave to amend when justice so requires. See FED. R. CIV. P. 15(a)(2).  "[A] court may consider a movant's 'undue delay' or 'dilatory motive' in deciding whether to grant leave to amend under Rule 15(a)." Krupski v. Costa Crociere S.

30

p. A., 560 U.S. 538, 553 (2010)(citing Foman v. Davis, 371 U.S. 178, 182 (1962)).  Moreover, "[l]eave to amend must generally be granted unless equitable considerations render it otherwise unjust." Arthur v. Maersk, Inc., 434 F.3d 196, 204 (3d Cir. 2006)(citing Foman, 371 U.S. at 182; Lorenz v. CSX Corp., 1 F.3d 1406, 1414 (3d Cir. 1993)).  Prejudice to the non-moving party is the touchstone for denying an amendment. Id. (citing Lorenz, 1 F.3d at 1414)(further citation omitted).

Although delay alone is not sufficient to justify denial of amendment, at some point, delay becomes undue, placing an unwarranted burden on the court and an unfair burden on the opposing party.  See Arthur, 434 F.3d at 204 (citing Cureton v. Nat'l Collegiate Athletic Ass'n, 252 F.3d 267, 273 (3d Cir. 2001); Adams v. Gould Inc., 739 F.2d 858, 868 (3d Cir. 1984)).  "[T]he question of undue delay requires that [the court] focus on the movant's reasons for not amending sooner." Cureton, 252 F.3d at 273 (citing Adams, 739 F.2d at 868).

Here, Benczkowski provides no explanation why she did not move to amend her complaint relative to PHRA exhaustion prior to September 2022 when the PHRC issued the closure letter in August 2021.  BCJ, however, has also provided no explanation as to how it is prejudiced by such an amendment. PHRA age-discrimination claims are analyzed similarly to ADEA claims and BCJ has defended those claims in its answer, in discovery, and by filing the motion for

summary judgment.  The court agrees that amendment should have been sought much sooner regarding administrative exhaustion, but the delay here is not to BCJ's actual detriment.  Since prejudice to the non-moving party is the touchstone and BCJ has advanced nothing of the sort, at least on the PHRA claims, Benczkowski's motion for leave to file an amended complaint regarding administrative exhaustion will be granted and BCJ's motion for summary judgment on plaintiff's PHRA claims in Count II and Count IV will be denied.

### 3. Motion to Amend – FMLA Claims

In addition to her request to supplement the administrative exhaustion allegations, Benczkowski also seeks leave to add two FMLA claims in an amended complaint.  Proposed Count V would add a claim for FMLA interference and proposed Count VI would add a claim for FMLA retaliation.  As discussed above, CFO May testified that she hired a former BCJ project accountant as a senior project accountant in June 2020 while Benczkowski exercised her right to FMLA leave.  (Doc. 23-1, Exh. C. K. May Dep. 135:9-136:1).  CFO May stated that Benczkowski might have been selected for the senior position, but May did not reach out to Benczkowski to see if she was interested. (Id. 136:2-137:14). Benczkowski indicates that she did not know of her denial of a promotional opportunity due to FMLA leave until CFO May testified at her deposition on August 25, 2022. (Doc. 29, Br. in Supp. at 6)  BCJ counters that the FMLA

amendments would be futile and that BCJ would suffer prejudice.  The court will address BCJ's futility arguments before turning to prejudice considerations.

### a. Futility

In addition to undue delay and dilatory motive, a court may deny leave to amend a complaint where the amendment would be futile or the amendment would prejudice the other party. See Foman, 371 U.S. at 178. "In assessing futility [of amendment], the district court applies the same standard of legal sufficiency as applies under Rule 12(b)(6)." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997)(citation and internal quotation marks omitted).  "By adhering to a Rule 12(b)(6) standard, the court is assured that any new claims, without true merit, will fail."  Provenzano v. Integrated Genetics, 22 F.Supp. 2d 406, 411 (D.N.J. 1998) (citations omitted).

The court tests the sufficiency of the complaint's allegations when considering a Rule 12(b)(6) motion.  To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim has facial plausibility when factual content is pled that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id. (citing Twombly, 550 U.S. at 570).  "Threadbare recitals of the elements of a

33

cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555).

BCJ argues that Benczkowski's proposed FMLA claims would violate the statute of limitations of such claims.  An FMLA action may be filed "not later than 2 years after the date of the last event constituting the alleged violation for which the action is brought[,]" 29 U.S.C. § 2617(c)(1), and "[i]n the case of such action brought for a willful violation. . .such action may be brought within 3 years[,]" 29 U.S.C. § 2617(c)(2).  Based upon CFO May's testimony about her actions and thought processes in hiring Sparacio as the new senior project accountant, Benczkowski moved to amend her complaint on September 30, 2022 with allegations that BCJ willfully violated the FMLA. (See Doc. 21, as amended by, Doc. 26).  Plaintiff's proposed claims for willful violations would be timely on their face.

BCJ further argues that such willfulness allegations are not supported by the record.  The court disagrees.  The testimony of CFO May speaks for itself:

> Q. If Ms. Benczkowski had been working in June as opposed to being on FMLA, would she have been selected for this position?
>
> A. She might have been.  I was kind of left holding the bag.

(Id. 136:2-7).

34

There are two generally recognized claims for FMLA violations. See
Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 301 (3d Cir. 2012).
"When employees invoke rights granted under the FMLA, employers may not
'interfere with, restrain, or deny the exercise of or attempt to exercise' these
rights." (Id. (citing 29 U.S.C. § 2615(a)(1)). "Nor may employers 'discharge or in
any other manner discriminate against any individual for opposing any practice
made unlawful.' " Id. (citing 29 U.S.C. § 2615(a)(2)). "The former provision is
generally, if imperfectly, referred to as 'interference' whereas the latter is often
referred to as 'retaliation.' " Id.  Based on CFO May's testimony, Benczkowski
has set forth plausible claims for FMLA interference and retaliation and the
proposed amendments to add these claims would not be futile.

### b. Prejudice

BCJ argues that it would be prejudiced by permitting plaintiff to add FMLA
claims at this time.  To deny an amendment, however, prejudice must be
"substantial or undue[.]" Cureton, 252 F.3d at 273 (citing Lorenz, 1 F.3d at 1414).
Courts "focus on the hardship to the defendant[] if the amendment were
permitted." Id. (citing Adams v. Gould Inc., 739 F.2d 858, 868 (3d Cir. 1984)).
The Third Circuit Court of Appeals has endorsed an approach that considers
"whether the assertion of the new claim would: (i) require the opponent to expend
significant additional resources to conduct discovery and prepare for trial; (ii)

35

significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." Long v. Wilson, 393 F.3d 390, 400 (3d Cir. 2004).

First, the court eliminates timeliness from the calculus.  Benczkowski deposed CFO May on August 25, 2022, when May implied that Benczkowski's FMLA leave left her holding the proverbial bag. (Doc. 23-1, Exh. C, K. May Dep. at 1).  The operative case management order required discovery to be completed by September 1, 2022 and dispositive motions were due on October 1, 2022. (Doc. 19).  Benczkowski filed her motion seeking leave to amend on September 30, 2022, thirty-six (36) days after CFO May's deposition and prior to the dispositive motion deadline. (Doc. 21).  The court finds no prejudice to BCJ in that passage of time.

Second, BCJ argues that there has been no discovery into a proposed allegation that plaintiff was better qualified for the promoted position of senior project accountant than the selectee, Sparacio. (Doc. 31, Br. in Opp. at 15). BCJ has identified no other specific allegations in the proposed FMLA causes of action which would require more discovery.

The court has carefully reviewed the depositions and documents provided by the parties with the motion for summary judgment and must disagree with BCJ's assessment that additional discovery would be burdensome or costly.

Benczkowski's qualifications have been thoroughly explored in discovery based on the pleadings to date. (Compare Doc. 1, Compl. ¶ 26 (alleging plaintiff's "productivity and performance continued at a high level and did not decline.") ¶ 33 (alleging plaintiff's "workload and performance were superior to the. . .other project accountants") with Doc. 4, Ans. ¶¶ 26, 33 (denying these allegations)). And both CFO May and CEO Bassett have already testified as to why Sparacio was selected as the senior project accountant. (See Doc. 23-1, Exh. C., K. May Dep. 135:9-136:1; Exh. D, 24:11-25:16). At most, Benczkowski's proposed allegations cited by the defendant would envision Sparacio's deposition and limited paper discovery. An additional short discovery period would not significantly delay the resolution of the dispute outside of any future motions to dismiss or motions for summary judgment filed by the defendant on the FMLA claims. Consequently, whatever prejudice to BCJ created by Benczkowski's proposed FMLA claims does not rise to the level of "substantial" or "undue" and thus the plaintiff's motion for leave to add FMLA claims in an amended complaint will be granted.

**Conclusion**

For the reasons set forth above, BCJ's motion for summary judgment (Doc. 20) will be denied and Benczkowski's motion for leave to file an amended complaint (Doc. 26) will be granted. Benczkowski shall file her amended

37

complaint exactly as proposed with her motion within seven (7) days. (Doc. 26, ECF pp. 9-27).  An appropriate order follows.


Date: ___8/1/24___                              _____

                                                JUDGE JULIA K. MUNLEY
                                                United States District Court